IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DONNA SALIBA, | ) | Case No. 1:21-CV-1908 |
| | ) | |
| Plaintiff, | ) | JUDGE CHRISTOPHER A. BOYKO |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff, Donna Saliba,[1] seeks judicial review of the final decision of the Commissioner of Social Security, denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act.  Saliba argues that a remand under Sentence Six of 42 U.S.C. § 405(g) is necessary so that an Administrative Law Judge ("ALJ") can consider new, material evidence.  Saliba also challenges the ALJ's negative findings, contending that the ALJ erred in finding that she did not meet or medically equal the criteria for Medical Listing 8.05.

A remand pursuant to Sentence Six is not warranted because Saliba has not established that the late-submitted evidence met the standard to be considered both new and material.  Further, because the ALJ otherwise applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Saliba's application for DIB be affirmed.

---

[1] It appears that during the proceedings, Saliba changed her name from "Donna Dissauer" to "Donna Saliba," as noted in various treatment notes.  (*See e.g.*, Tr. 13, 455).  A motion for leave to proceed in forma pauperis before this court referred to "Donna Dissauer Saliba."  *See* ECF Doc. 2.  For clarity, I refer to the plaintiff as "Donna Saliba."

## I.     Procedural History

Saliba applied for DIB on July 16, 2019.  (Tr. 242).[2]  Saliba alleged that she became disabled on August 25, 2017, due to: (i) scoliosis; (ii) fibromyalgia; (iii) psoriatic arthritis; (iv) spinal arthritis; (v) narrowing of her spinal column; (vi) eczema and psoriasis on her hands, arms, face, and legs; (vii) "short leg syndrome;" and (viii) osteoarthritis.  (Tr. 279, 286).  The SSA denied Saliba's application initially and upon reconsideration.  (Tr. 166-179, 181-188).  Saliba requested an administrative hearing.  (Tr. 201).

On September 23, 2020, ALJ Pamela Loesel heard Saliba's case and denied her application in a November 10, 2020 decision.  (Tr. 115-125, 130-165).  In doing so, the ALJ determined at Step Three of the sequential evaluation process that Saliba did not satisfy the criteria of Medical Listing 8.05.  (Tr. 118).  At Step Four, the ALJ determined that Saliba had the residual functional capacity ("RFC") to perform light work, except that:

> [Saliba] is able to lift and carry 20 pounds occasionally and 10 pounds frequently.  [She] is able to stand and walk four hours of an eight-hour workday.  [Saliba] is able to sit for six hours of an eight-hour workday.  [She] can perform unlimited pushing and pulling other than shown for lifting and/or carrying.  [She] can occasionally climb ramps and stairs, but never lifting and/or carrying.  [She] can occasionally stop, kneel, or crouch.  [She] can never crawl.  [She] must avoid all exposure to hazards, including unprotected heights and dangerous moving machinery.  [She] can perform frequently handling and fingering bilaterally.

(Tr. 118-119).

On December 2, 2020, Saliba requested that the Appeals Council review the ALJ's decision.  (Tr. 238-241).  Saliba submitted additional evidence to the Appeals Council that was not available until after the ALJ issued her decision.  (Tr. 8-106).  On August 21, 2021, the Appeals Council determined that Saliba's new evidence was partially unrelated to the period at issue and a portion did not show a reasonable probability that it would change the outcome of the

---

[2] The administrative transcript is filed as ECF Doc. 8.

ALJ's decision.  (Tr. 1-2).  The Appeals Council declined any further review, rendering the

ALJ's decision the final decision of the Commissioner.  (Tr. 1-3).  On October 8, 2021, Saliba

filed a complaint for judicial review.  ECF Doc. 1.[3]

## II.    Evidence

### A.    Personal, Educational, and Vocational Evidence

Saliba was born on August 24, 1972 and was 45 years old on the alleged onset date.

(Tr. 286).  Saliba completed two years of college and had no specialized training.  (Tr. 280).  She

had prior work as a caregiver, administrative assistant, and as a weight reduction specialist, of

which the ALJ determined she could still perform the latter two.  (Tr. 123, 280).

### B.    Relevant Medical Evidence

Because the focus of Saliba's argument concerning the medical evidence exclusively

addresses conditions implicated by Listing 8.05, only those conditions will be discussed.

On September 19, 2017, Saliba saw Laura Kwasniak, M.D., her dermatologist, about her

psoriasis.  (Tr. 331, 416).  Saliba's interval history was noted as "[f]laring," and nothing

abnormal was noted on her physical examination.  *Id.*  Dr. Kwasniak's impression was that

Saliba had contact dermatitis, noting "[b]listers, pseudovessiculation, linear patches and plaques,

and well demarcated, geometric eczematous patches distributed on the arms, hands, and trunk."

*Id.*  Dr. Kwasniak also noted that Saliba had psoriasis, indicating she had "[p]ink well defined

plaques with scale distributed on the hands."  *Id.*  Dr. Kwasniak prescribed Saliba additional

medication and instructed her to resume using Topicort and stop using Derma-smoothe oil.  *Id.*

On October 10 and November 8, 2017, Saliba saw Dr. Kwasniak.  (Tr. 417-418).  Saliba

reported that her dermatitis and psoriasis had improved.  *Id.*  During both visits, Dr. Kwasniak

_____

[3] This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b).

noted plaques and scaling on Saliba's hands and arms.  *Id.*  But during the November 8 appointment, she also noted it on Saliba's scalp and conducted a physical examination, not noting any abnormalities.  (Tr. 418).  Dr. Kwasniak restarted Saliba on desoximetasone during the October 8 appointment, which Saliba continued as needed.  (Tr. 417-418).

On April 2, 2018, Saliba saw Dr. Kwasniak.  (Tr. 419).  She reported that she had recently had flare-ups and areas were cracked and painful.  *Id.*  On examination, Dr. Kwasniak did not note any abnormalities.  *Id.*  Dr. Kwasniak's impression, however, was that Saliba had allergic contact dermatitis, noting demarcated, geometric eczematous patches on her arms and trunk that were "inadequately controlled."  *Id.*  Dr. Kwasniak instructed her on the use of hypoallergenic products and prescribed two different topical creams and a medication.  *Id.* Dr. Kwasniak also found that Saliba had impetigo, noting "[e]rosions with yellow-honey colored crust located on [her] right ear."  *Id.*  She instructed Saliba to use antibacterial soaps and topical antibiotics and prescribed her an oral antibiotic.  *Id.*

On April 16, 2018, Saliba saw Dr. Kwasniak, reporting that the impetigo and dermatitis medication helped.  (Tr. 420).  On examination, Dr. Kwasniak did not note any abnormalities. *Id.*  Her impression was that Saliba still had psoriasis, noting pink papules with scaling on Saliba's face, hands, and right ear.  *Id.*  She prescribed a topical foam for Saliba to apply to her scalp and to continue the other medication.  *Id.*  Dr. Kwasniak noted that Saliba's dermatitis was resolving.  *Id.*

On May 30, 2018, Saliba saw Dr. Kwasniak, reporting that her psoriasis had improved, and the inflamed patches appeared to be "drying up."  (Tr. 422).  On examination, Dr. Kwasniak did not note any abnormalities.  *Id.*  Her impression was that Saliba had impetigo on her ears, for which she prescribed medication.  *Id.*  Dr. Kwasniak found that Saliba had lymphadenopathy on

her neck and psoriasis, noting defined plaques with scaling on her forearms, right thenar
eminence, and left palm.  *Id.*  She instructed Saliba to continue her other medications.  *Id.*

On August 1, 2018, Saliba saw Dr. Kwasniak for her psoriasis.  (Tr. 423).  Dr. Kwasniak
instructed her to discontinue using desoximetasone.  *Id.*

On September 12, 2018, Saliba saw Dr. Kwasniak.  *Id.*  Saliba reported that she had
constant pain and itching that interfered with her work.  *Id.*  On examination. Dr. Kwasniak did
not note any abnormalities.  *Id.*  Her impression was that Saliba had impetigo and dermatitis with
demarcated, geometric eczematous patches and pseudovessiculation on her arms.  *Id.*  She
instructed Saliba to continue her medication and noted that she would consider a biopsy.  *Id.*

On September 24, 2018, Saliba saw Dr. Kwasniak.  (Tr. 424).  Dr. Kwasniak found that
Saliba had contact dermatitis with eczematous patches on her arms, face, and legs.  *Id.*  She
instructed Saliba to avoid allergens and prescribed her an oral steroid.  *Id.*  Dr. Kwasniak also
found that Saliba had impetigo, which was improving, and instructed her to continue her
medication.  *Id.*

On October 24, 2018, Saliba saw Dr. Kwasniak.  (Tr. 425).  Saliba reported some
improvement with her medication, noting that her hands and arms were still dry, and she still had
itchy areas on her back.  *Id.*  Dr. Kwasniak noted Saliba followed the treatment plan and, on
examination, did not note any abnormalities.  *Id.*  Her impression was, however, that Saliba had
contact dermatitis with eczematous patches on her palms, right forearm, left upper arm, and left
inferior lateral neck.  *Id.*  She prescribed a topical ointment and noted that she would taper off the
steroids.  *Id.*  Dr. Kwasniak also found that Saliba's impetigo had resolved.  *Id.*

On November 14, 2018, Saliba saw Dr. Kwasniak.  (Tr. 426).  Dr. Kwasniak noted that
Saliba followed her treatment plan and, on examination, did not identify any abnormalities.  *Id.*

Dr. Kwasniak's impression was that Saliba had inadequately controlled contact dermatitis, noting eczematous patches on her right radial palm, left thenar eminence, left neck, left upper arm, and left thigh.  *Id.*  She prescribed a topical ointment and prednisone, noting that stronger topical medications were not covered by Saliba's insurance.  *Id.*

On April 5, 2019, Saliba saw Dr. Kwasniak.  (Tr. 427).  Dr. Kwasniak noted that Saliba had followed her treatment plan and did not report any abnormalities on examination.  *Id.*  Her impression was that Saliba had inadequately controlled psoriasis, noting pink papules, scaling, and erythematous plaques on her hands, left ear, and right arm.  *Id.*  She also noted that Saliba's psoriasis was associated with psoriatic arthritis.  *Id.*  Dr. Kwasniak indicated she would look into Otezla or biologic medicines and prescribed a hydrocortisone ointment.  *Id.*

On April 16, 2019, Saliba saw Dr. Kwasniak, complaining of skin irritation on her right eyelid, which had been present for several days and cause moderate swelling and pain.  (Tr. 428).  On examination, Dr. Kwasniak did not note any abnormalities; her impression was that the irritation was dermatitis, and she prescribed Saliba medication.  *Id.*

On May 7, 2019, Saliba saw Dr. Kwasniak for a follow-up appointment regarding her eye.  (Tr. 429).  Saliba reported that the medication improved her dermatitis and that, after starting Otezla about a month prior, her hands had started flaring up and swelling and her fingertips blistered.  *Id.*  For about a week, she also had a moderate rash on her arms and legs, which was raised and itchy.  *Id.*  On examination, Dr. Kwasniak did not note any abnormalities, and her impression was that Saliba had inadequately controlled psoriasis, noting that her skin was not much better despite the addition of Otezla.  *Id.*

On June 18, 2019, Saliba saw Dr. Kwasniak.  (Tr. 430).  Dr. Kwasniak did not note any abnormalities on physical examination.  *Id.*  Dr. Kwasniak's impression was that Saliba had

impetigo on her ears and prescribed an antibiotic.  *Id.*  She also found that Saliba had psoriasis and should stop taking Otezla because of side effects.  *Id.*  Dr. Kwasniak also found that Saliba had dermatitis on her sternum, left elbow, and right forearm.  *Id.*  She continued Saliba's treatments and noted that a biopsy or lab work would be considered.  *Id.*

On July 9, 2019, Saliba saw Dr. Kwasniak, complaining of a mild rash that was red and painful on her hands.  (Tr. 432).  On examination, Dr. Kwasniak did not note any abnormalities.  *Id.*  Her impression was that Saliba had dermatitis on her forehead and forearms.  *Id.*  For the condition, Dr. Kwasniak prescribed two topical creams and prednisone.  *Id.*  In addition to dermatitis, Dr. Kwasniak found that Saliba had inadequately controlled psoriasis.  *Id.*  She instructed Saliba to start Topicort and consider biologic medicine, "given [her] rather severe hand involvement."  *Id.*  Dr. Kwasniak also conducted a biopsy that was found to be consistent with eczematous dermatitis.  (Tr. 423, 441).

On July 30, 2019, Saliba saw Dr. Kwasniak.  (Tr. 440).  Dr. Kwasniak noted that Saliba followed her treatment plan, and, on physical examination, Dr. Kwasniak did not note any abnormalities.  *Id.*  Dr. Kwasniak's impression was that Saliba had dermatitis on her upper sternum and forearms.  *Id.*  She prescribed prednisone and instructed her to continue her other medications.  *Id.*  Dr. Kwasniak also found that Saliba had impetigo on her left ear and prescribed an oral antibiotic.  *Id.*

On August 27, 2019, Saliba saw Dr. Kwasniak.  (Tr. 618).  On physical examination, Dr. Kwasniak did not indicate any abnormalities.  *Id.*  Her impression was that Saliba had contract dermatitis on her arms, face, and legs, and instructed Saliba to reevaluate all of her products and reduce her prednisone dosage.  *Id.*  Dr. Kwasniak also found that Saliba had

psoriasiform dermatitis, noting that she was likely flaring up due to her contact dermatitis and possibly due to the reduction of the prednisone medication.  *Id.*

On August 31, 2019, Dariush Saghafi, M.D. completed a manual muscle test.  (Tr. 452). It indicated that Saliba's grasp, manipulation, pinch, and fine coordination were normal. (Tr. 450).  Her joint movement was also normal.  (Tr. 451).

On October 19, 2019, Saliba went to the Cleveland Clinic, complaining of dermatitis. (Tr. 455).  She reported that her dermatitis was worse over the last 2 to 3 days, and her last flare-up was a "couple months" earlier.  *Id.*  She also reported weeping skin; an itchy, tender scalp; and mild improvement with an antibiotic.  *Id.*  In a review of her symptoms, she was noted to have itching skin and a rash.  (Tr. 457).  On examination, it was noted that she was distress, actively crying, and had erythematous patches with dry scales on her forehead, around her hairline, and on both ears; mild weeping on her left ear; and erythematous scaly patches on both forearms.  (Tr. 457-458).  She was diagnosed with atopic dermatitis, prescribed medication, and discharged.  (Tr. 458).

On October 28, 2019, Saliba saw Alex Hirsh, MD, at her dermatologist's office.  She reported experiencing a recent flare-up but indicated it had improved on being seen at an urgent care.  (Tr. 619).  On examination, Dr. Hirsh noted no abnormalities, but that Saliba had diffused erythema and scaling without any signs of infection on her scalp.  *Id.*  Dr. Hirsh's impression was that Saliba had psoriasiform dermatitis, and medication was prescribed.  *Id.*

On November 26, 2020, Saliba saw Dr. Kwasniak.  (Tr. 620).  On examination, Dr. Kwasniak did not note any abnormalities.  *Id.*  Her impression was that Saliba had continued psoriasiform dermatitis on her right scalp, arms, face, and legs.  *Id.*  She instructed Saliba to continue her treatment and prescribed her a solution for her scalp.  *Id.*

On January 2, 2020, Saliba saw Dr. Kwasniak. (Tr. 621). Saliba reported improvement and, on examination, Dr. Kwasniak did not note any abnormalities. *Id.* Dr. Kwasniak's impression was that Saliba's should continue her psoriasis treatments and add Otezla back. *Id.*

On February 13, 2020, Saliba saw Dr. Kwasniak, reporting some improvement and "activity" on the bottom of her feet. (Tr. 623). On examination, Dr. Kwasniak did not note any abnormalities. *Id.* Her impression was that Saliba had a stye on her eye, eyelid dermatitis, and psoriasiform dermatitis; she prescribed various medication for treatment. *Id.*

On February 25, 2020, Saliba saw Deshawn Jones, CNP. (Tr. 465). Saliba reported that her hands were painful, and her psoriasis had worsened. *Id.* Nurse Jones's impression was that her symptoms "seem[ed]" more mechanical than inflammatory, and he recommended that she should get labs and film of her hand. *Id.* Saliba reported that she started Otezla in November 2019 and her dosage was increased in January 2020, with 40% improvement in her psoriasis. *Id.* On examination, Nurse Jones noted that Saliba had psoriasis on her upper extremities, scalp, around her eyes, right knee, and right shoulder, which she treated with topical treatment. *Id.* He also noted that her skin color, texture, and turgor were normal, and she did not have any suspicious rashes or lesions. (Tr. 467). In a review of her symptoms, Saliba indicated that, in addition to a rash, she also had hair loss and nail changes. (Tr. 466). Jones's assessment was that Saliba had psoriatic arthritis. (Tr. 470).

On April 15, 2020, Saliba saw Nurse Jones, complaining of worsening psoriasis and drainage from a rash. (Tr. 590). She noted psoriasis on her upper extremities, face, ears, elbows, and around her eyes, and was treating them with topical medication. (Tr. 591). But a review of her symptoms was normal. *Id.* Jones advised her to follow-up with her dermatologist about her

skin infections, the possibility of stopping Otezla and starting Humira, and the need to resolve infections before switching medication.  (Tr. 597).

On May 8, 2020, Saliba saw Dr. Kwasniak.  (Tr. 626).  Saliba reported that her dermatitis and impetigo were better with medication, and Dr. Kwasniak indicated Saliba followed the treatment plan.  *Id.*  On examination, Dr. Kwasniak did not note any abnormalities, and her impression was that Saliba's impetigo had resolved, but she had eczematous dermatitis on her arms, face, hands, and neck.  *Id.*  Saliba was instructed to continue with prednisone.  (Tr. 627).

On May 27, 2020, Saliba saw Dr. Kwasniak, reporting that her rash was flaring up.  (Tr. 628).  On examination, Dr. Kwasniak did not note any abnormalities.  *Id.*  Her impression was that Saliba had eczematous dermatitis and an inadequately controlled skin infection, for which she prescribed a topical ointment and antibiotics.  *Id.*

On June 8, 2020, Saliba saw Dr. Kwasniak; she reported that her dermatitis and skin infection were doing better with medication.  (Tr. 629).  Dr. Kwasniak indicated Saliba had followed her treatment plan and, on examination, did not note any abnormalities.  *Id.*  Her impression was that Saliba had photodermatitis, possibly related to her antibiotic, and dermatitis, for which she was to continue her medications and take prednisone.  (Tr. 629-630).

On July 7, 2020, Saliba saw Dr. Kwasniak and reported that her conditions were unchanged with the medication.  (Tr. 631).  Dr. Kwasniak noted that Saliba followed the treatment plan and, on examination, did not note any abnormalities.  *Id.*  Her impression was that Saliba had unspecified dermatitis related to sun exposure and impetigo, the latter of which she prescribed antibiotics for.  (Tr. 631-632).  Dr. Kwasniak also found that Saliba had dermatitis that was either eczematous or psoriasiform, which she ordered lab reports on.  (Tr. 632).

10

On August 12, 2020, Saliba met virtually with Deepa Patadia, M.D.  (Tr. 655, 658).
Saliba reported her history of atopic dermatitis and psoriasis, as well as Dr. Kwasniak's concern
about her "sun allergy."  (Tr. 655).  She indicated that she was in the sun for about 30 to 40
minutes when her hands became red and swollen.  *Id.*  She reported that this was unusual, and
the rash took about a week to resolve.  *Id.*  On examination, Dr. Patadia observed that Saliba had
an erythematous rash on her hands and face with "overlying scale."  (Tr. 657).  Dr. Patadia
assessed that it was likely a psoriasis flare-up or dermatitis, and recommended treating it with the
topical medications prescribed and to start Zyrtec and Benadryl.  (Tr. 658).

On August 19, 2020, Saliba saw Dr. Kwasniak, reporting that her impetigo had worsened
and her photodermatitis was moderate.  (Tr. 634).  Dr. Kwasniak noted that Saliba had followed
the treatment plan and, on examination, did not note any abnormalities.  *Id.*  Her impression was
that Saliba had impetigo, for which she prescribed Bactrim.  (Tr. 634).  She also found that
Saliba had dermatitis that was either psoriasiform or photodermatitis, for which she continued
Saliba's topical treatments and conducted a biopsy.  (Tr. 634-635).  The biopsy indicated that
Saliba had epidermal spongiosis.  (Tr. 640).

On August 24, 2020, Saliba saw Susan Mathai, M.D.  (Tr. 610, 614).  She reported
stopping Otezla because it caused depression and anxiety, despite it helping her skin.  (Tr. 610).
On examination, Dr. Mathai noted that Saliba had lesions, a rash, and itching; pain on palpation
of the joints in both hands, wrists, and fingers; and "extensive" skin rashes on her arms, face,
neck, and scalp.  (Tr. 611, 614).  Dr. Mathai instructed Saliba to start Humira.  *Id.*

On August 24, 2020, Saliba also saw Dr. Kwasniak.  (Tr. 624).  On examination,
Dr. Kwasniak did not note any abnormalities, and her impression was that Saliba had impetigo
on portions of her scalp and forehead.  *Id.*  Dr. Kwasniak also found that Saliba had allergic

contact dermatitis on her left and right hands and forehead and psoriasis.  *Id.* She prescribed various medications, but discontinued Otezla because it gave Saliba depression.  (Tr. 624-625).

On September 2, 2020, Saliba saw Dr. Kwasniak.  (Tr. 636).  On examination, Dr. Kwasniak did not note any abnormalities.  *Id.*  Her impression was that Saliba had impetigo, prescribing her a topical ointment, and psoriasis on her arms, which she prescribed Humira for. *Id.*  Dr. Kwasniak also noted that Saliba had improved photodermatitis, for which she instructed Saliba to continue her treatment and decrease her prednisone dosage.  (Tr. 636-637).

On September 9, 2020, Saliba returned to Dr. Kwasniak, reporting that her impetigo was worse, and she believed she was having an allergic reaction to Bactrim.  (Tr. 638).  On examination, Dr. Kwasniak did not note any abnormalities and assessed that Saliba's impetigo would best be treated after receiving test results.  *Id.*  She also found that Saliba'd had dermatitis in sun-exposed areas and prescribed a topical treatment and prednisone.  *Id.*

### C.    Relevant Opinion Evidence

#### 1.    State Disability Report – Laura Kwasniak, M.D.

On July 29, 2019, Dr. Kwasniak completed an evaluation of her treatment of Saliba for the state's disability department.  (Tr. 331).  She indicated that she treated Saliba from May 11, 2015 to July 9, 2019, and diagnosed her with unspecified dermatitis, recurrent staph infections, psoriasis, and contact dermatitis.  (Tr. 333).  Dr. Kwasniak described how Saliba had experienced repeated skin infections due to the breakdown of her skin from her psoriasis and dermatitis on her hands, scalp, face, and ears.  *Id.*  Clinically, since 2015, Saliba had had scaling, oozing plaques on her hands, ears, and scalp.  *Id.*  Dr. Kwasniak noted that Saliba had been on a variety of medications and had good compliance, the only issues being when insurance changes resulted in her therapy stopping.  (Tr. 334).  In terms of therapy, Dr. Kwasniak explained that

12

"[Saliba] ha[d] a chronic relapsing condition that [was] difficult to control." *Id.*  Her assessment was that, given the impact Saliba's conditions had on her hands, it was painful for Saliba to perform small motor skills and, given the recurrent infections on her hands, she would be "unable to interact with others by direct care giving contact while infected." *Id.*

### 2.    State Agency Consultants

On September 26, 2019, Venkatachala Sreenivas, M.D., reviewed Saliba's medical records to evaluate her physical limitations.  (Tr. 175-177).  He found that Saliba had exertional limitations, specifically that she could occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds, stand and/or walk for four hours in an 8-hour day, and sit for a total of 6 hours in an 8-hour day.  (Tr. 175).  In determining that Saliba had these limitations, Dr. Sreenivas noted Saliba had a history of dermatitis, recurrent staph infections, and psoriasis, which included scaling, oozing plaques intermittently on her hands, ears, and scalp.  *Id.*  He noted that the condition had been difficult to control, she had "some periods of noncompliance w/ tx recommendations," and her flares lasted less than 3 months when treatment was initiated.  *Id.* He did not attribute any other limitations to Saliba's hands or skin conditions.  (*See* Tr. 175-177).

On April 8, 2020, Elizabeth Das, M.D., reevaluated the medical record and possible resulting limitations.  (Tr. 185-187).  Regarding Saliba's hands and skin conditions, Dr. Das agreed with Dr. Sreenivas's limitations.  (Tr. 185-186).

### D.    Relevant Testimonial Evidence

Saliba testified at the hearing.  (Tr. 138-156).  She explained that she would clean up the dishes, load the dishwasher, tidy up, and do other light housework; but her hands made it difficult and things like vacuuming were difficult because they would become painful.  (Tr. 138, 155-156).  She could fold the laundry and cook things that could be heated and served.

(Tr. 139).  She could drive and did some grocery shopping.  *Id.*  Her hobbies included being outside, and she had previously crocheted and wrote.  (Tr. 139, 155-156).  She would use a computer and her phone for writing and social media.  (Tr. 140).

Saliba explained that she worked at Comfort Keepers, a home healthcare agency for the preceding 13 years.  (Tr. 141-142).  Initially, she started out doing administrative work with them full time.  (Tr. 141).  In that role she was generally at a desk and made use of a phone, but not a computer or typewriter, relying on handwritten notes.  (Tr. 142).  About six months after starting, she transitioned to being a caregiver where she assisted people with their daily activities.  (Tr. 143).  In that role, she was on her feet most of the day and had to lift less than 25 pounds, although she had to assist clients in wheelchairs in transferring in and out of the chair.  (Tr. 144).  Presently, she assisted Comfort Keepers with human resources work and had been working in that capacity since 2017.  (Tr. 145).  She worked part time, five days a week.  *Id.*  In that capacity, she was generally seated at a desk and did not need to lift or carry.  (Tr. 146).  She estimated that a few times a month she would come in late or leave early because of her conditions.  (Tr. 152).  Her employer understood her circumstances and did not take any negative action against her for her absences.  (Tr. 153).

Saliba explained that the biggest issue keeping her from working was the pain and how she could not sit, stand, or walk continually.  (Tr. 149).  She also indicated her hands were swollen, cracked, and bleeding, making it hurt to type, write, or "do anything."  (Tr. 149, 155).  She had called off work because of her conditions, stating she had missed over a week the prior month.  *Id.*  She testified that the integrity of her skin was compromised, leading her to have numerous infections, and to be on "constant antibiotics."  (Tr. 149-150).  Due to the psoriasis around her eyes, she could not wear glasses, which made working on the computer hard due to

the resulting eye strain, headaches, and fatigue.  (Tr. 150).  Her skin conditions also made it

difficult to sleep because of her itchiness.  (Tr. 151).

Saliba testified that she had stopped taking Otezla because it caused her to have anxiety

and depression.  (Tr. 151).  Her rheumatologist had prescribed Humira, but she had to have a

staph infection clear up first.  *Id.*  She explained that her skin would weep; bleed; be dry, flakey,

and cracked; and cause red splotches on her face and arms.  (Tr. 153-154).  These symptoms

usually happened when she was having a flare-up, which she felt had occurred constantly for the

past five years, but really "picked up" in 2019.  (Tr. 155).

## III.   Law & Analysis

### A.   Standard of Review

The court reviews the Commissioner's final decision to determine whether it was

supported by substantial evidence and whether proper legal standards were applied.  42 U.S.C.

§ 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  "Substantial

evidence" is not a high threshold for sufficiency.  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154

(2019).  "It means – and means only – such relevant evidence as a reasonable mind might accept

as adequate to support a conclusion."  *Id.* (quotation marks omitted).  Even if a preponderance of

the evidence supports the claimant's position, the Commissioner's decision still cannot be

overturned "so long as substantial evidence also supports the conclusion reached by the ALJ."

*O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. Aug 7, 2020) (quotation marks

omitted)).  Under this standard, the court cannot decide the facts anew, evaluate credibility, or

re-weigh the evidence.  *Jones v. Comm's or Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).  And

"it is not necessary that this court agree with the Commissioner's finding," so long as it meets

this low standard for evidentiary support.  *Rogers*, 486 F.3d at 241.  This is so because the

Commissioner enjoys a "zone of choice" within which to decide cases without being second-guessed by a court. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right."). And the court will not uphold a decision, when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked.").

### B.    Sentence Six Remand

Saliba argues that remand under Sentence Six is warranted because the Appeals Council refused to consider new and material evidence she submitted. ECF Doc. 10 at 15-17. She argues that about two months after the ALJ issued her decision, she had continued treatment for her lesions with Humira and later Cosentyx, both of which failed to provide any relief. ECF Doc. 10 at 16. This evidence, she contends, could reasonably have been expected to change the outcome of the ALJ's decision because it "confirms that Plaintiff continued to have significant symptoms in her hands," her continued compliance with her treatment, and the effect her skin condition had on her hands. ECF Doc. 10 at 16-17. The Commissioner disagrees, asserting that the evidence is cumulative. ECF Doc. 12 at 7-8.

A court may remand a case for the Commissioner to consider newly discovered evidence pursuant to Sentence Six of 42 U.S.C. § 405(g).  To obtain such a remand, the claimant must show that: (i) the evidence is new; (ii) the evidence is material; and (iii) good cause excuses the claimant's failure to incorporate the evidence into the record of a prior administrative proceeding.  42 U.S.C. § 405(g); *Casey v. Sec'y of Health & Hum. Serv.*, 987 F.2d 1230, 1233 (6th Cir. 1993).  "A sentence six remand is comparable to a Fed. R. Civ. P. 60(b) motion for a new trial based on newly discovered evidence."  *See Cranfield v. Comm'r of Soc. Sec.*, 79 F. App'x 852, 858 (6th Cir. 2003).  Evidence is "new" if it did not exist or was unavailable at the time of the administrative proceeding.  *Finkelstein v. Sullivan*, 496 U.S. 617, 626 (1990).  And the Sixth Circuit takes a "harder line" approach to good cause – a claimant cannot simply point to the fact that the evidence was not created until after the ALJ hearing but must establish good cause for why she did not cause the evidence to be created and produced until after the administrative proceeding.  *See Perkins v. Apfel*, 14 F. App'x 593, 598-99 (6th Cir. 2001).

The evidence at issue consists of (i) 2021 notes from Dr. Mathai indicating Saliba had extensive skin rashes, particularly bad on her hands and elbows, and she seen about 25% improvement since starting Humira; (ii) a note indicating Saliba had ulcerative blepharitis on her eyelids; (iii) images of cracked skin on Saliba's hands; (iv) medical notes from Saliba's gynecological and physical therapy visits.  (Tr. 9-14, 16-17, 19-106).

Saliba had good cause for not providing the notes sooner because she had not attended the appointments until after the decision.  *See Perkins*, 14 F. App'x at 598-99.  However, the mere fact that they were created *after* the ALJ's decision does not necessarily render them "new" evidence.  *See Elliott v. Apfel*, 28 F. App'x 420, 423-24 (6th Cir. 2002) ("[The plaintiff] fails to make the showing because the purportedly new evidence is not new at all; it is merely

17

cumulative.").  Here, Saliba's newly submitted evidence is cumulative in many respects.  As she notes in her brief, it "confirms" that she had significant symptoms in her hands and her compliance with her treatment, which was repeatedly noted throughout the treatment records. *See* ECF Doc. 10 at 16.  Saliba's reaction to Humira is, arguably, not cumulative because she had yet to be on it at the time of the ALJ's decision.  (*See* Tr. 151).  And she contends that her records while on Humira demonstrate her compliance and the further involvement of her hands. *See* ECF Doc. 10 at 16.

But those records only confirmed that the medication was not successful in resolving her condition and that she was compliant with it.  (Tr. 8-13).  But the ALJ acknowledged that she was, generally compliant, with "some periods" of noncompliance, which she attributed to insurance issues.  (*See* Tr. 121).  Further, the ALJ was aware that Saliba's skin infections also occurred on her hands, but simply did not last over three months and did not interfere with the use of her hands for gripping or fine manipulation.  (Tr. 122).  And none of Saliba's "new" evidence shows the contrary.  Accordingly, a remand under Sentence Six is unnecessary.

## C.    Step Three: Medical Listing 8.05

Saliba contends that the ALJ erred in finding that her skin lesions were not sufficiently extensive, persistent, and intrusive of her activity that they meet or medically equal Listing 8.05. ECF Doc. 10 at 11-12.  She argues that Dr. Kwasniak's notes demonstrate that her skin lesions persisted for at least three months, despite her continued treatment.  ECF Doc. 10 at 12-14.  She adds that Dr. Kwasniak's notes show that her skin condition involved her hands and that, based on her testimony, it was painful for her to perform small motor skills.  ECF Doc. 10 at 14-15. The Commissioner disagrees.  ECF Doc. 12 at 3-7.

At Step Three, a claimant has the burden to show that she has an impairment or combination of impairments that meets or medically equals the criteria of an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1. *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001); 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant meets all of the criteria of a listed impairment, she is disabled; otherwise, the evaluation proceeds to Step Four. 20 C.F.R. § 404.1520(d)-(e); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *see also Rabbers v. Comm'r of SSA*, 582 F.3d 647, 653 (6th Cir. 2009) ("A claimant must satisfy all of the criteria to meet the listing.").

In evaluating whether a claimant meets or equals a listed impairment, an ALJ must "actually evaluate the evidence, compare it to [the relevant listed impairment], and give an explained conclusion, in order to facilitate meaningful judicial review." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011) (noting that, without such analysis, it is impossible for a reviewing court to determine whether substantial evidence supported the decision). The ALJ "need not discuss listings that the [claimant] clearly does not meet, especially when the claimant does not raise the listing before the ALJ." *See Sheeks v. Comm'r of SSA*, 544 F. App'x 639, 641 (6th Cir. 2013). "If, however, the record raises a substantial question as to whether the claimant could qualify as disabled under a listing, the ALJ should discuss that listing." *Id.* at 641; *see also Reynolds*, 424 F. App'x at 415-16 (holding that the ALJ erred by not conducting any Step Three evaluation of the claimant's physical impairments, when the ALJ found that the claimant had the severe impairment of back pain).

"A claimant must do more than point to evidence on which the ALJ could have based his finding to raise a 'substantial question' as to whether he satisfied a listing." *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 432 (6th Cir. 2014) (quoting *Sheeks*, 544 F. App'x at 641-42). "Rather, the claimant must point to specific evidence that demonstrates he

reasonably could meet or equal every requirement of the listing." *Id.* (citing *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)).  "Absent such evidence, the ALJ does not commit reversible error by failing to evaluate a listing at Step Three." *Id.* at 433; *see also Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014) (finding harmless error when a claimant could not show that he could reasonably meet or equal a listing's criteria).

Listing 8.05 provides:

The Appendix lists the following as a disability: "[d]ermatitis (for example, psoriasis, [], atopic dermatitis, ...), with extensive skin lesions that persist for at least 3 months despite continuing treatment as prescribed." 20 C.F.R. § 404, subpt. P., app. 1, § 8.05. "[E]xtensive skin lesions" are defined as:

those that involve multiple body sites or critical body areas, and result in a very serious limitation. Examples of extensive skin lesions that result in a very serious limitation include but are not limited to:

a. Skin lesions *that interfere with the motion of your joints* and that very seriously limit your use of more than one extremity; that is, two upper extremities, two lower extremities, or one upper and one lower extremity.

b. Skin lesions *on the palms of both hands* that very seriously limit your ability to do fine and gross motor movements.

c. Skin lesions on the soles of both feet, the perineum, or both inguinal areas that very seriously limit your ability to ambulate.

20 C.F.R. § 404, subpt. P, , app. 1, § 8.00(C)(1) (emphasis added).

The ALJ applied the proper standards in her evaluation of Listing 8.05 at Step Three of the sequential evaluation process.  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  In reviewing Saliba's conditions under the Listing and in articulating her RFC determination, the ALJ addressed each of the major factors raised in Listings 8.00 and 8.05, namely: the extensiveness of the lesions, their duration, and what, if any, limitations they caused.  (*See* Tr. 118, 121-122). Neither the ALJ nor the parties genuinely contest whether Saliba's skin conditions affected

multiple sites on her body, as the medical records routinely indicated that she had outbreaks on her hands, head, and arms. *See generally* ECF Doc. 10; ECF Doc. 12; (Tr. 118-122).

The ALJ also found, however, that despite their persistent presence, the treatment notes did not indicate that Saliba's conditions lasted for at least three months during her flare-ups. (*See* Tr. 118, 122). Saliba takes a broad perspective in asserting that the ALJ's finding was erroneous in this regard, contending that because she was treated for the same overarching condition on multiple visits, she met the Listing's requirement. *See* ECF Doc. 10 at 12-14. However, it is not merely the skin condition that Listing 8.05 looks at for persistence, but rather the continued presence of specific skin lesions over the course of three months despite treatment. *See* 20 C.F.R. § 404, subpt. P., app. 1, § 8.05. Looking at the specific lesions Saliba sought treatment for, it is clear that the location of the lesions and their believed underlying cause changed from appointment to appointment. (*See e.g.*, Tr. 423-451, 455-458, 465-467, 590-597, 620-623, 626-632, 655-658). For example, on September 19, 2017, Dr. Kwasniak found that Saliba had psoriasis on her hands and contract dermatitis on her arms, hands, and trunk, but one month later, Saliba's conditions had improved and two months later, she had some plaque on her arms, hands and scalp but reported that she was doing well. (*See* Tr. 416-418). Similarly, in October and November 2018, Saliba was treated for contact dermatitis, but at her next appointment in April 2019, Saliba was treated for psoriasis and no mention of contract dermatitis was made. (*See* Tr. 425-427). And as a result, the medical records did not demonstrate any lesions that persisted over the course of three months.

Lastly, the ALJ also considered what, if any, limitation Saliba's skin conditions cause and found that they did not seriously limit the use of her hands, a finding supported by substantial evidence. 42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241. Saliba disagrees with this finding. But

in support, Saliba relies on one opinion provided by Dr. Kwasniak, (Tr. 333-334), and her own testimony.  *See* ECF Doc. 10 at 14-15.  The ALJ specifically addressed Dr. Kwasniak's opinion, noting that it was not specific in its asserted limitations, suggestive that the limitations were based on Saliba's former employment as a home healthcare worker, and "not fully consistent" with the other evidence.  (Tr. 122).  And the ALJ's finding that Saliba's conditions did not cause serious limitations is supported by substantial evidence, as Saliba's routine physical examinations never indicated any limitation based on her skin conditions.  (*See* Tr. 416, 418-420, 422-423, 425-430, 432, 618, 620-624, 626-631, 634, 636, 638).  Further, Dr. Saghafi conduct muscle testing that indicated Saliba's grasping, manipulation, pinch, and fine coordination were normal.  *See Biestek v. Berryhill*, 139 S. Ct. at 1154; (Tr. 450).

Accordingly, the ALJ properly analyzed Saliba's conditions under Listing 8.05 and reached reasonable findings supported by substantial evidence.  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  And the ALJ's decision must be affirmed.

## IV.    Recommendation

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Saliba's application for DIB be affirmed.

Dated: November 3, 2022

Thomas M. Parker
United States Magistrate Judge

**Objections, Review, and Appeal**

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge.  Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C. § 636(b)(1); Local Rule 72.3(b).  Properly asserted objections shall be reviewed de novo by the assigned district judge.

* * *

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation.  *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019).  Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).  Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 U.S. Dist. LEXIS 100383, *6 (W.D. Ky. June 15, 2018) (quoting *Howard*).  The failure to assert specific objections may in rare cases be excused in the interest of justice.  *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).